858 F.2d 670
 57 USLW 2318
 FEDERAL DEPOSIT INSURANCE CORP., Plaintiff-Appellee,
v.
KEY BISCAYNE DEVELOPMENT ASSOCIATION, etc., et al., Defendants,
Rodgers Construction, Inc. of Nashville, Tennessee, a
Tennessee corporation, a/k/a Rodgers Construction,
Inc., Defendant-Appellant.
 No. 86-5741.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 25, 1988.
 
 Michael Nachwalter, Kenny, Nachwalter & Seymour, P.A., Thomas D. Hall, Miami, Fla., for Rodgers Const.
 Chaim T. Kiffel, Kirland & Ellis, Garrett B. Johnson, Chicago, Ill., for FDIC.
 Appeal from the United States District Court for the Southern District of Florida.
 Before RONEY, Chief Judge, TJOFLAT, Circuit Judge, and CLEMON*, District Judge.
 TJOFLAT, Circuit Judge:
 
 I.
 
 1
 At some time prior to April 1980, Key Biscayne Development Association (KBDA) devised a plan to purchase and develop a forty-eight acre parcel of land on Key Biscayne, Florida. The plan called for KBDA to acquire the land in subparcels over a three-year period, beginning in April 1980, and then engage a general contractor to renovate a hotel located on the property and construct several condominium buildings. To finance this venture, KBDA went to Continental Illinois National Bank and Trust Company (Continental), and Continental agreed to loan KBDA the necessary funds. From April 1980 to October 1983, Continental loaned KBDA more than $70 million; the loans were secured by five mortgages on the Key Biscayne property and on the hotel.
 
 
 2
 In October 1983, KBDA selected Rodgers Construction, Incorporated (Rodgers) as the general contractor for the project. The record does not indicate the contract price KBDA agreed to pay Rodgers for the work or the date and amount of the progress payments it made to Rodgers. The record does establish, though, that KBDA owed Rodgers $1.9 million when Continental's assignee, the Federal Deposit Insurance Corporation (FDIC), brought this mortgage foreclosure suit on October 31, 1984. By that date, KBDA's indebtedness to Continental, secured by the five mortgages noted above, totalled more than $85 million.[1]
 
 
 3
 In its complaint for foreclosure against KBDA, the FDIC alleged that KBDA was in default on all of its loans in three respects: first, KBDA had not made any of the payments due since July 1, 1984; second, the project had not been completed by October 1, 1984 as required by the loan agreements; and, third, KBDA had failed to deposit certain funds in escrow as called for by the agreements. In addition to KBDA, the FDIC named as parties defendant nine materialmen who had worked on or supplied materials to the project and had filed notices of mechanics' liens against the property for payments due them.[2] The FDIC did not name Rodgers because Rodgers had filed no such notice. When Rodgers learned about the suit, it filed a notice of lien, claiming that KBDA owed it $1.7 million, and moved the district court to allow it to intervene in the action as a party defendant. The FDIC immediately amended its complaint to add Rodgers as a party defendant, and the court dismissed Rodgers' motion as moot.
 
 
 4
 Rodgers answered the FDIC's amended complaint and also filed two counterclaims.[3] In its answer, Rodgers admitted that KBDA was indebted to the FDIC as alleged in the amended complaint, but interposed as bars to the FDIC's claim for relief six affirmative defenses, four of which are relevant here. Rodgers' first defense was that the FDIC's complaint failed to state a claim for relief. Its second defense was that the KBDA mortgages were not in default, and thus the FDIC could not maintain its action, because Continental had waived the requirement that KBDA complete its project by October 1984. Rodgers' third defense was that the FDIC's suit was barred by laches; the suit should have been brought at an unspecified earlier date. Finally, its fourth defense was that the mortgages could not be used to defeat the claims of KBDA's creditors, such as Rodgers, because Continental and KBDA held and were developing the property as joint venturers. According to Rodgers, the joint venture was formed when Continental provided the capital, i.e., the loaned funds, for the project and KBDA contributed the land and its knowledge and expertise as a real estate developer. This conduct, Rodgers asserted, rendered the mortgages invalid as to the creditors of the joint venture.[4]
 
 
 5
 In its first counterclaim, Rodgers alleged that the FDIC, as KBDA's joint venturer, was liable to it for the progress payments due under its contract with KBDA; it sought a money judgment for $1.9 million and a declaration that Rodgers' mechanics' lien was superior to the FDIC's mortgages. In its second counterclaim, Rodgers again asked the court to declare its mechanics' lien superior to the FDIC's mortgages, on the ground that it would be inequitable to allow the mortgages to remain superior to its mechanics' lien.
 
 
 6
 Following the completion of discovery, the FDIC moved for summary judgment. The district court granted the motion, concluding that Rodgers' affirmative defenses and counterclaims were barred by 12 U.S.C. Sec. 1823(e) (1982), which provides that the FDIC's ability to enforce the terms of a bank loan it has purchased from a failing bank cannot be impaired by an "agreement" between the debtor and the bank not contained in the instrument evidencing the loan.[5]
 
 
 7
 Rodgers appeals, contending that section 1823(e) precludes none of the affirmative defenses or the counterclaims stated above, and that material issues of fact remain for trial. We affirm, but do so for reasons other than those relied upon by the district court.
 
 II.
 
 8
 Most of our reasons for affirming the district court can be stated in a sentence or two. Rodgers' first affirmative defense--that the amended complaint failed to state a claim for relief--is patently frivolous. Its second affirmative defense--that Continental waived one of the three grounds for declaring the loans in default--is also frivolous. Waiver is a defense possessed only by the debtor, KBDA. Even if we were to hold that Rodgers could raise it as well, the defense fails because Rodgers does not dispute that two of the grounds for declaring the loans in default are valid--KBDA's failure to pay the loans according to their tenor and KBDA's failure to deposit funds in escrow.
 
 
 9
 Rodgers' laches defense fails for three reasons: first, like the waiver defense, laches is a defense belonging only to the debtor; second, Rodgers has failed to specify when the FDIC, or Continental, should have brought suit and thus has demonstrated no basis for a finding of undue delay; and, third, Rodgers has alleged no prejudice resulting from undue delay. See Florance v. Johnson, 366 So.2d 527, 528 (Fla.Dist.Ct.App.1979).
 
 
 10
 Rodgers' final defense--that the mortgages are invalid because Continental and KBDA were joint venturers--fails for lack of proof. Rodgers contends that the loan agreements themselves established the joint venture. Each of the loan agreements states to the contrary: "It is understood and agreed that [Continental] by issuing this [loan] or by taking any action pursuant hereto shall not be deemed a partner or joint venturer with [KBDA]...." Rodgers points to nothing in the loan documents which refutes this disclaimer. It nonetheless argues that the interpretation of the loan agreements is a question of fact and that the issue of whether the agreements established a joint venture should have been submitted to a jury. According to Rodgers, a jury could find a joint venture on the basis of the expert witness testimony it proffered to the district court. The witness, a former vice president of the Real Estate Industries Division of Citicorp/Citibank, reads the loan agreements as creating a joint venture between Continental and KBDA for the purposes Rodgers alleges.
 
 
 11
 It is basic hornbook law that the construction of a contract is a matter for the court, not the jury. To be sure, a case may present a factual dispute for jury resolution, such as the meaning of a contract term or whether a provision not included in the contract document was agreed upon by the parties, but it does not follow that it is the jury's role, after resolving the factual dispute, to decide the legal effect of the parties' agreement. Deciding the legal effect of an agreement, or whether an enforceable agreement even exists, is a matter solely within the province of the court.
 
 
 12
 As for Rodgers' expert's opinion as to the effect of the loan agreements, we view the opinion as nothing more than legal argument. We reject the expert's opinion because we are convinced, not only by the disclaimer quoted above but also by the language of the loan agreements, that the agreements did not create a joint venture between Continental and KBDA. As the district court observed, the loan agreements are nothing more than "typical garden variety ordinary construction lending documents."
 
 
 13
 Our rejection of Rodgers' joint venture argument disposes of its first counterclaim, which is founded on that argument. We thus turn to Rodgers' remaining counterclaim--that equity requires the subordination of the FDIC's mortgage liens to Rodgers' mechanics' lien. According to the parties, Florida law governs this question; we will assume that it does. Under Florida law, the court may declare a mechanics' lien superior to the lien of a previously recorded mortgage if the mortgagee misled a materialman into believing that if he improved the mortgaged property, the mortgagor's debt to the materialman for the improvement would be paid before the debt to the mortgagee. See, e.g., Rinker Materials Corp. v. Palmer First Nat'l Bank & Trust Co., 361 So.2d 156, 158-59 (Fla.1978); Gancedo Lumber Co. v. Flagship First Nat'l Bank, 340 So.2d 486, 487 (Fla.Dist.Ct.App.1976), cert. denied, 348 So.2d 947 (Fla.1977). Rodgers has alleged none of these elements, and nothing in the record suggests that any of them exists. Accordingly, Rodgers' counterclaim for an equitable lien superior to the liens held by the FDIC fails as a matter of law.
 
 
 14
 AFFIRMED.
 
 RONEY, Chief Judge, concurring:
 
 15
 Although I concur in Judge Tjoflat's opinion for the reasons stated therein, I think the district court should be affirmed also for the reasons set forth in the district court's Memorandum Opinion dated June 3, 1986 (S.D.Fla. Case No. 84-2570-Civ.].
 
 
 
 *
 Honorable U.W. Clemon, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 The FDIC had become Continental's assignee on September 26, 1984. Continental was in serious financial difficulty, and the FDIC, exercising its statutory authority, purchased a number of Continental's bad loans as part of a $4.5 billion permanent aid program designed to stabilize the bank; among the loans purchased were the loans to KBDA, all of which were in default. The FDIC's authority to make such a purchase is provided by 12 U.S.C. Sec. 1823(c)(1) (1982), under which the FDIC
 is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors [of the FDIC] may prescribe ... to purchase the assets or securities of ... any insured bank--
 (A) if such action is taken to prevent the closing of such insured bank;
 ... or
 (C) if, when severe financial conditions exist which threaten the stability of a significant number of insured banks or of insured banks possessing significant financial resources, such action is taken in order to lessen the risk to the [FDIC] posed by such insured bank under such threat of instability.
 
 
 [2]
 These nine materialmen had asserted mechanics' liens against the property pursuant to Fla.Stat. Sec. 713.01-37 (1984)
 
 
 [3]
 Rodgers actually filed three counterclaims. We read them as stating two claims for relief
 
 
 [4]
 Rodgers also asserted, as defenses, that the loans were usurious and that Continental and the FDIC had failed to give KBDA proper notice of default. The district court rejected these defenses, and Rodgers does not question its ruling
 
 
 [5]
 Section 1823(e) states:
 No agreement which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the [FDIC] unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.